THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ANTHONY ROBERTS, Appellant.

First Department, April 25, 1991

## APPEARANCES OF COUNSEL

*Jonathan Raines* for appellant.

*Robert L. Moore* of counsel *(Stanley R. Kaplan* with him on the brief; *Robert T. Johnson, District Attorney,* attorney), for respondent.

## OPINION OF THE COURT

CARRO, J. P.

This court is not only statutorily empowered to reverse a

judgment of conviction which is the result of a verdict that was, in whole or in part, against the weight of the evidence (CPL 470.15 [5]), but should, in fact, do so even if the evidence is legally sufficient from a technical standpoint. *(People v Bleakley,* 69 NY2d 490.) Applying this principle, we reverse the conviction and dismiss the indictment, as we agree with the trial court that the verdict was against the weight of the evidence.

The incident in question occurred on January 31, 1988 at 11:30 P.M. when Marion Clarke, aged 72, answered a knock at her apartment door. As a result of this, an assailant, or possibly two assailants, gained entry to the apartment and inflicted upon her substantial physical injuries. According to Dr. Elias Moukarzel, these included multiple injuries to the head and back, fractures of the nasal bone and eye socket, and lacerations of the back, requiring four days of hospitalization. It is equally uncontroverted that the perpetrator ransacked her bureau drawers and stole money from Clarke. Therefore, the sole issue to be resolved at trial was whether the defendant committed those criminal acts. In determining whether there was sufficient credible evidence to establish the defendant as the perpetrator, we believe that the background and relationship of defendant and Clarke is pertinent.

Defendant, aged 33 at the time of trial, with no criminal convictions, had been known to Clarke since he was eight years old, and had lived downstairs from Clarke until he entered the Army. He subsequently married and, approximately one year prior to the incident in question, moved into the apartment next door to Clarke. He had been steadily employed. Approximately four months before the robbery, Clarke had him in her apartment to wash her windows, a chore for which she paid him.

The salient facts of Clarke's personal background, insofar as they are pertinent to her credibility, relate to her health, and particularly to her memory. Clarke's personal physician of 12 years, Dr. Paul Chrzanowski, testified for the defense, acknowledged that she required medication to treat "mild mental deterioration" and "memory lapses". He further asserted that she had told him she had had a cataract condition, although she denied this at trial. A psychiatrist called by the defense, Dr. Earle Alexander, testified, based upon Clarke's medical records and her previous testimony, that she suffered from "Amnesia Confabulatory Syndrome". Symptoms thereof include rambling, confusion, and a tendency to fabricate for-

gotten events by filling in the details through some sort of suggestion.

The only evidence against defendant was the testimony of Clarke. Her testimony at trial was internally inconsistent and replete with contradictions of previous statements. Because she could not immediately recall the incident in question, events subsequent to that date are of importance in analyzing the facts. The morning after the incident, Clarke's friend Evelyn Wilkes called her. Upon sensing that something was wrong, she contacted Clarke's neighbor Anna Howe, who went to Clarke's apartment and then called the police. While Clarke asserted that she had told Wilkes she had been "fighting all night, that someone had robbed me", she had no recollection of what she had told Howe.

Detective Denise Taylor, who interviewed Clarke on February 1, 3 and 8, 1988 at the hospital and Clarke's apartment, testified that on none of those occasions was Clarke able to ascertain the identity of the perpetrator. Significantly, Clarke testified that Detective Taylor told her during one of these interviews "anything I remembered or dreamed or thought of that came back to me to tell her about it".

Three weeks after the robbery, Clarke spent the night at her sister's house in order to be close to Dr. Chrzanowski's office, as she had an appointment with him the next morning to have stitches removed from her head. Clarke testified that as she and her sister were on their way to the doctor's office, "all of a sudden I remembered seeing [defendant]. I was on the kitchen floor, and I looked down, and I saw Anthony Roberts standing on the right side of the door facing left down the hall and beckoned like this to someone."[1] Clarke immediately thereafter acknowledged, still on direct examination, that "I tried to remember did I dream this or is this what I remember."

It was not until another week had elapsed, and Clarke was watching an episode of the popular detective series Matlock, when suddenly "the memory came to me as to what happened". Before reciting the various versions of the incident which were given by Clarke, focus should be placed upon the precipitating event, the Matlock show. Clarke recalled it as follows: "One night I was looking at Matlock and all of a

---

1. Dr. Alexander testified that this "memory" could have related to the window-washing, rather than the robbery, and that this may have suggested the identification of defendant as a result of confabulatory syndrome.

sudden this man was going in, he was taking some—he was stealing some papers out of a box and his hand reached in the box. He had on black gloves and a light gray jacket, and that's when the memory came to me as to what happened. I remembered a great deal of what happened that night."

This television image prompted Clarke to remember that her assailant had been similarly dressed. While recalling the gray sweater or jacket and black gloves, she could not recall the pants or footwear the perpetrator wore. Furthermore, Clarke's recollection, inspired by Matlock, involved more than one neighbor. She asserted that at approximately 11:30 P.M., Adolph Bauman, her neighbor from across the hall, knocked on her door and asked to use her phone because he was locked out of his apartment. Clarke contended that she disengaged two locks, but left the chain engaged when she opened the door. She asserted that defendant then came from behind Bauman and burst into the apartment, but her testimony as to this mode of entry is rebutted by the fact that the chain was unbroken.

Detective Taylor recalled that, in mid-March, Clarke said that she thought there was a second assailant, aside from defendant, and that she "very strongly" believed it to have been her neighbor Bauman. Nevertheless, Bauman was never arrested in connection with the subject crime. Clarke alternately testified that Bauman was present, and that he was not. Impeaching this account were her accounts before the Grand Jury, and at an examination before trial in a related civil suit, which, in addition, were inconsistent with one another. At the Grand Jury, Clarke testified that she herself closed the door, whereupon defendant started to choke her. In the civil proceeding, she testified "I just started telling him to go back, I will call, that is when this guy just came around and broke into the door, I don't know how he got in, how he got in there."

In any event, regardless of how and by whom the entry was made, Clarke was choked into unconsciousness by her assailant. When she regained consciousness, she found herself on the kitchen floor, and allegedly saw defendant standing in her front doorway motioning towards someone or something. She allegedly lost consciousness again immediately afterward. Clarke maintained that when she regained consciousness a second time, she heard noise emanating from her bedroom. She claimed that she was able to walk into the living room, to get a statue from above a wall unit, apparently to use for

protection. She did not try to leave the apartment or to use the telephone in the dining area for help, although nobody was present to prevent her from doing either. Instead, she went to the bedroom, where, she contended, defendant was ransacking her drawers, and another individual, allegedly Bauman, was inside the closet.[2] She confronted the perpetrator, asking "how could you do this to me," telling him she kept no money in her home, but then took about $20 from her purse and handed it to him.

Clarke testified that she then hit defendant on the head with the statue and ran away. This was impeached by her Grand Jury testimony that, after giving the perpetrator the cash, she "put the statue on the bed or forgotten it or something". As to the circumstance involving Clarke's attack upon the assailant, she testified that she was kicked in the back, after which she either ran to the kitchen or, as she later claimed, was herself hit with the statue while in the bedroom, after which she ran to the kitchen, where she fainted. She claimed that she remained unconscious for the rest of the day, until she was awakened by the telephone call made by Wilkes.

The jury, after being deadlocked, found defendant guilty of first degree robbery and burglary, and not guilty of attempted murder and first degree assault. Defendant was permitted to remain at liberty pending sentencing.

The sentencing proceeding was rather unusual. The People declined to make a recommendation as to sentencing. Defense counsel urged that the conviction was against the weight of the evidence, and that defendant, who was going to appeal, "stands before the court still professing innocence of these crimes of which he was found guilty." Defendant simply stated: "An innocent man has been found guilty. That's all I have to say."

Most compelling were the comments of the sentencing court. The court recited a litany of inconsistencies in Clarke's evidence, referring numerous times to her confusion, the "dream-like" quality of her testimony and the suggestiveness of the Matlock detective story. The court concluded: "On that testimony, and the court's observations of the demeanor and manner in which Ms. Clarke testified, the court must, in conscience, state that it believes the evidence, at least as to

---

2. This man was not visible, as the closet door was closed, and other than a vague assertion, there is nothing to indicate the presence of a second perpetrator in the bedroom.

her identification of the defendant, to be against the weight of the evidence. Notwithstanding her positive identification of Anthony Roberts as the perpetrator, she was candid in her assertions that her memory of the defendant as the perpetrator may have been a dream. The manner in which she remembered tends to support the view that it was a dream. The story of the sequence of events at times had a dream-like quality to it. * * * Here, Ms. Clarke's long acquaintance with the defendant, rather than being a reassuring feature of her identification contributes to the distinct possibility that she was quote, remembering, unquote, not the actual perpetrator but, rather, someone she knew well, who had, within a few months of the incident, actually been in her apartment."

The court made clear what it would have done were it not otherwise constrained by the limitation of its power under the Criminal Procedure Law: "I do not have the power to set aside the verdict as against the weight of the evidence, but I cannot be blind to my view of the evidence in considering the appropriate sentence. I have given the case careful and extensive consideration, with exceptional regard for the province of the jury. I do not, therefore, easily or lightly, find the verdict against the weight of the evidence. But, in conscience, I could not say otherwise."

The court then imposed the mandatory minimum sentence, which it stayed, pending appeal, without objection by the People.

We are of the view that this court should now do that which the Trial Judge herein was not empowered to do (People v Goodfriend, 64 NY2d 695, 697; CPL 330.30) and reverse the conviction as being against the weight of the evidence (People v Kidd, 76 AD2d 665; People v Yanik, 63 AD2d 574; CPL 470.15 [5]). We take occasion to note that the court's instruction to the jury, repeated several times, that they "not discuss the case in small groups during dinner," and "not discuss the case in small groups [while sequestered at the hotel]" could arguably be misconstrued as permitting the jurors to discuss the case outside the jury room, unsupervised, as long as they were all present, and should be avoided. The appropriate instruction to the jurors once deliberations have begun is that they should not discuss the case until they are all reassembled in the jury room. (CPL 310.10; see, People v Coons, 75 NY2d 796.)

The judgment of the Supreme Court, Bronx County (Wil-

liam C. Donnino, J.), rendered February 9, 1990, convicting defendant, after a jury trial, of burglary in the first degree and robbery in the first degree, and sentencing him to concurrent indeterminate terms of imprisonment of 2 to 6 years, should be reversed on the law, the facts, and as a matter of discretion in the interest of justice, and the indictment dismissed. The matter is remitted to the trial court for the purpose of entering an order in favor of the accused pursuant to CPL 160.50, not less than 30 days after service of this order upon the respondent, with leave during this 30-day period to respondent to move and seek any further stay of the implementation of CPL 160.50 as in the interest of justice is required.

ELLERIN, KUPFERMAN, KASSAL and RUBIN, JJ., concur.

Judgment, Supreme Court, Bronx County, rendered on February 9, 1990, reversed, on the law, the facts, and as a matter of discretion in the interest of justice, and the indictment dismissed. The matter is remitted to the trial court for the purpose of entering an order in favor of the accused pursuant to CPL 160.50, not less than 30 days after service of a copy of this court's order upon the respondent, with leave during this 30-day period to respondent to move and seek any further stay of the implementation of CPL 160.50 as in the interest of justice is required.